**David POWELL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08-90-00348-CR.**

Court of Appeals of Texas,
El Paso.

Dec. 18, 1991.

Ralph H. Brock, Chuck Lanehart, Chappell, Lanehart & Aldridge, Lubbock, for appellant.

Richard Barajas, Dist. Atty., Fort Stockton, for appellee.

Before OSBORN, WOODARD and KOEHLER, JJ.

OPINION

KOEHLER, Justice.

A jury convicted David Powell, Appellant, of murder, and the trial court assessed punishment at sixty years' confinement in the Texas Department of Criminal Justice, Institutional Division. In two points of error, Appellant challenges the sufficiency of the evidence and the effec-

tiveness of trial counsel's assistance. We reverse and order an acquittal.

The underlying indictment charged that Appellant "intentionally and knowingly cause[d] the death of a child, KEVIN COLEMAN, by striking the said KEVIN COLEMAN on or about the head with instruments unknown to the grand jury." As indicted, the State had the burden to prove beyond a reasonable doubt that: (1) a person (Appellant); (2) intentionally and knowingly; (3) caused the death of an individual (Kevin Coleman); (4) by striking the deceased on or about the head. ·See Butler v. State, 769 S.W.2d 234, 237, 239 (Tex. Crim.App.1989); Tex.Penal Code Ann. § 19.02 (Vernon 1989); Tex.Code Crim.Pro. Ann. art. 21.03, 21.04 (Vernon 1989).

■ In review of Appellant's sufficiency of evidence point, we are constrained to view the evidence in a light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Earhart v. State,* No. 70,343, 1991 WL 183135 (Tex. Crim.App. Sept. 18, 1991). If there is a reasonable hypothesis other than the guilt of the accused, guilt beyond a reasonable doubt is not a rational finding. *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex.Crim.App. 1983, on motion for rehearing). In applying this standard, we note that the conclusion of guilt is warranted if the combined and cumulative force of all the incriminating circumstances points to such guilt even if every fact does not point directly to Appellant's guilt. *Gribble v. State,* 808 S.W.2d 65, 74 (Tex.Crim.App.1990). However, proof amounting to no more than a strong suspicion is insufficient to establish guilt beyond a reasonable doubt. *Id.*

Viewed in that light, the facts reveal that Kevin Coleman, the deceased, resided with Appellant (his cousin), Lora Powell (Appellant's wife), and the couple's two-year-old son. The family lived in a Sul Ross Univer-

sity married housing duplex in Alpine. On August 17, 1987,[1] Appellant and his wife walked a short distance to Pizza Hut to have supper with a friend, Arthur Gonzalez, while Kevin remained at home. Gonzalez testified that they ate pizza and drank some beer until approximately 9 p.m.

Sul Ross University Police Chief, Charles Boyd, testified that he and Officer Duane Rowland went to Appellant's residence on the morning of August 18 in response to a call for assistance by the Alpine Police Department. Upon arriving at the scene, Boyd interviewed paramedic Michael Scudder who had responded to a call for a sick child. Scudder found Kevin lying in bed without a pulse and immediately attempted to establish an airway, but he was unable to do so due to rigor mortis. Scudder did not attempt any further resuscitation based upon Lora's representation that Kevin had not been breathing and had no heartbeat for approximately forty-five minutes. Rowland testified that bruises were apparent on the child's back and legs and that he notified the child's mother by phone of the death. Boyd testified that Appellant arrived at the house approximately one hour later and became very emotional upon learning of Kevin's death.

Boyd also testified that Appellant made a voluntary statement on September 11. The statement was admitted into evidence. Reading from the statement, Boyd stated that Appellant indicated that Kevin had misbehaved while Appellant was at a Pizza Hut with Lora and Gonzalez. Consequently, Appellant instructed Kevin to get a belt, however, Appellant retrieved a "switch" from a tree outside with which Appellant admitted "spanking" Kevin on the legs and back.[2] Subsequently, Appellant explained to Kevin the reason why the discipline was administered and instructed him to go to bed. Appellant stated that he later heard a noise as if someone had fallen sometime after midnight, and he allegedly found Kevin lying on the floor.

---

**1.** All dates refer to 1987 unless otherwise stated.

**2.** In his statement, Appellant emphasized that he did not "whip" Kevin with the belt; instead, he used the switch.

Appellant told Boyd that Kevin was not bleeding anywhere but that he was extremely stiff-jointed. Kevin suffered from an illness commonly referred to as Hunter's Disease in which the body has difficulty digesting certain compounds which results in periods of joint stiffness, tension and immobility. Pursuant to instructions from Kevin's mother, Appellant put Kevin back in bed and talked to him to help him relax which enabled him to overcome the momentary stiffness. Afterward, Appellant allegedly went to sleep in the living room. Appellant indicated that Lora woke him at approximately 5:30 a.m. and that he inquired whether Kevin was all right to which she affirmatively responded. Appellant stated that he went to bed and that he later checked in on Kevin at approximately 9 a.m. at which time "there was no response; so I went to the doctor's office to see what to do and I called the ambulance from there." [3]

Gonzalez testified that he saw Appellant at a convenience store near Appellant's home on the morning of August 18. Gonzalez stopped to talk to him, and Appellant "seemed all shaken up and he told me that Kevin wasn't responding to anything." Gonzalez testified that: (1) Appellant was near a pay phone; (2) Appellant stated that he had notified EMS; (3) Appellant stated that he was attempting to contact Kevin's mother; and (4) Appellant asked whether Gonzalez would go to Appellant's house to stay with Lora. Gonzalez related that he did as Appellant requested and that he found Kevin to be without a pulse, not breathing and "cold and rigid" prior to the ambulance's arrival. He testified that he saw Appellant later in the afternoon and that "he was all shaken up and he was crying and he said Kevin was dead."

On September 17, Boyd obtained a written consent from Lora to search their residence. Boyd stated that he asked Lora about the whereabouts of the switch and that she retrieved it without assistance from behind the living room couch. Subsequently, the switch was admitted into evidence. Immediately thereafter, the State also introduced into evidence a belt obtained from Appellant. However, Boyd testified that his investigation did not reveal the weapon that could have inflicted the blows that resulted in Kevin's death. Likewise, the foreman of the grand jury testified that neither the switch nor the belt were represented by the State's witnesses as being the instrument used to cause Kevin's death.

Ralph Erdmann, a forensic pathologist who performed an autopsy on the body of the deceased, testified that Kevin died from blunt force trauma to the left fronto-parietal and the top portions of the head. Erdmann testified that the trauma caused bleeding inside Kevin's cranial cavity which resulted in increased and fatal pressure being applied to the cardiorespiratory centers of the brain. Erdmann also testified about numerous contusions found on Kevin's chest, sides, back, arms and hands which led him to conclude that he suffered from battered child syndrome. Erdmann stated that the only serious bodily injury were the blows to the head and that the chest and abdominal beatings caused no injury to Kevin's internal organs or skeletal structure. When asked to further describe the type of instrument likely used to inflict the deadly blunt force trauma, Erdmann attested that "[i]t could be from a bat to a fist to a four by four." No testimony was elicited as to whether the death causing injuries could have been caused by either the belt or the switch previously introduced into evidence.

Additionally, the evidence affirmatively eliminated the possibilities that Kevin died from either accidental, natural or suicidal means. Erdmann opined from the age of the deceased, the condition and amount of blood found within the cranial cavity and the edema and bruising of the brain that Kevin most likely suffered the fatal blows no more than an hour prior to his tragic death. Neither Appellant nor Lora testified, and the defense rested without producing any evidence on Appellant's behalf. The Appellant did, however, elicit testimony from Boyd that Kevin's arms exhibited

---

3. Appellant did not have a phone at his residence.

marks which resembled "stab wounds" caused by Lora's fingernails. Boyd also testified that someone other than Appellant admitted to striking Kevin with a belt, but that Appellant was the only person who admitted using a switch.

■ Appellant admits that Kevin was severely beaten and that he spanked Kevin late on August 17 about the legs and back. He argues that the evidence established that Kevin died of blunt force trauma to the head and that the other wounds on Kevin's body were skin wounds incapable of causing death. Thus, according to Appellant, it rationally follows that the evidence fails to connect him to the offense as alleged, i.e., striking the deceased on the head. Consequently, Appellant argues that the State's evidence does no more than raise suspicion as to his guilt due to his admitted presence at the scene, and the evidence wholly fails to eliminate the reasonable hypothesis raised by the evidence that Lora could have inflicted the fatal injuries. As a result, Appellant professes no reasonable trier of fact could have rationally found guilt beyond a reasonable doubt. We agree.

While "the State is not required to prove to a moral certainty that the circumstances presented actually exclude every hypothesis that the criminal act may have been committed by another person," it must, however, "exclude every reasonable hypothesis raised by the evidence that would tend to exculpate the accused." *Ransom v. State*, 789 S.W.2d 572, 577 (Tex.Crim. App.1989). Viewing the evidence in the light most favorable to the verdict the record establishes that Scudder, the paramedic, arrived at Appellant's residence shortly after 10 a.m. on August 18. Upon determining that Kevin had no pulse and was not breathing, Lora told Scudder that the deceased had been in such a condition for about forty-five minutes.[4] While the death certificate indicates that Kevin was formally pronounced dead at 10:27 a.m., the State's evidence establishes that Kevin

most likely died at approximately 9 to 9:15 a.m. Furthermore, Erdmann testified that without medical attention, Kevin could have survived the fatal blows to the head for at most one hour. Thus, the evidence indicates that the blunt force trauma was inflicted no earlier than 8 a.m.

The State's evidence demonstrates that Appellant applied some discipline, beating Kevin severely with a switch, late in the evening of August 17. Also, the evidence demonstrates that Appellant last spoke with Kevin sometime after midnight on August 18. From the Appellant's statement, introduced by the State, Lora indicated to Appellant that Kevin was all right at approximately 5:30 a.m. on August 18. At approximately 9 a.m., Appellant "went in and checked on Kevin, and there was no response." This statement is corroborated by Scudder's testimony as to the length of time Kevin was believed to have been without a heartbeat. Since the evidence demonstrates that Lora was the last person to see Kevin "alive", there is some evidence tending to exculpate Appellant.

The question remains as to whether this evidence raises a reasonable hypothesis. We find that it does for the following reasons: (1) Erdmann's testimony indicates that the fatal blows were inflicted no earlier than 8 a.m.; (2) Appellant last saw Kevin "alive" sometime after midnight but prior to 5:30 a.m.; (3) Lora saw Kevin "alive" and "all right" sometime near 5:30 a.m.; and (4) Appellant's corroborated statement indicates that he next saw Kevin at approximately 9 a.m. at which time the deceased was unresponsive. The chief of police testified that someone other than Appellant admitted to beating Kevin and that Lora admitted to inflicting the fingernail wounds found on both of Kevin's arms which Boyd compared to stab wounds.

Additionally, there is no direct evidence that *Appellant* ever struck the deceased about the head. The marks on the chest, back and legs some of which were admittedly inflicted by Appellant did not result in

---

**4.** No other evidence was presented to indicate how long Kevin had been without circulatory

and respiratory functions.

serious bodily injury. Moreover, neither the belt nor the switch were proffered by the State as being the potential murder weapon. We find these facts comparable to those in *Jackson v. State*, 652 S.W.2d 415 (Tex.Crim.App.1983). In *Jackson*, the defendant was accused of causing the death of her daughter "by striking the child on the head with her elbows." *Id.* at 416. The Court held that the State had not discharged its burden "by simply proving that appellant struck the child with her elbows." *Id.* at 419. The coroner testified that it was "unlikely and improbable" that the admitted elbow strikes to the head caused the death. *Id.* Thus, the Court held the State failed to prove the elbow strikes by the accused actually caused the child's death.

In the instant case, Appellant admitted striking Kevin about the legs and back with a switch. Erdmann testified that the deceased's body exhibited marks and bruises consistent with Appellant's admission. However, Erdmann stated that neither of these marks caused serious bodily injury and that those marks indicated only a "skin beating." Thus, as in *Jackson*, it is unlikely and improbable that the beatings admittedly applied by Appellant caused Kevin's death. In another similar case, the Court of Criminal Appeals found that the accused's admission of hitting the deceased was insufficient to substantiate the finding of guilt when an expert testified that a more serious injury, unrelated to the admission, caused the child's death. *Pickering v. State*, 596 S.W.2d 124, 128–29 (Tex. Crim.App.1980). Similarly, we find that the admitted hitting of the deceased about the legs and back which amounted to a "skin beating" does not constitute any probative evidence that Appellant inflicted the much more serious and deadly blows to the head.

While the State's evidence raises a suspicion of Appellant's culpability, it failed to dispel the reasonable hypothesis that someone other than Appellant inflicted the fatal blows. This hypothesis arises due to Lora's simultaneous presence coupled with her statement as to infliction of the fingernail wounds. Boyd's testimony in which he stated that someone other than Appellant admitted whipping the deceased buttresses this exculpatory inference. Furthermore, the reasonableness of the hypothesis is heightened by the lack of evidence to indicate that Appellant did more than inflict superficial injuries to Kevin's torso, arms and legs.

Despite the presence of disgusting facts indicating that Kevin was the victim of an unwarranted and abusive beating, the circumstantial evidence simply does not support the conviction of Appellant for the offense of murder as pled in the indictment. Thus, we sustain Point of Error No. One.

Having sustained the first point, it is unnecessary for us to address the second point in which Appellant complains that he was denied effective assistance of counsel. However, in view of the seriousness of the crime charged, a few comments are in order. We note from the record that the Appellant was represented throughout the trial exclusively by a duly "qualified law student" under rules promulgated by the Supreme Court of Texas pursuant to the mandate of Acts 1975, 64th Leg., Ch. 56, p. 120 (codified as Tex.Gov't.Code Ann. § 81.-102 (Vernon 1988)). As required by the rules, he was supervised by a licensed attorney (the law student's brother) who was (presumably) properly certified by his local bar and registered by the General Counsel of the State Bar of Texas to act as a supervisor. The "supervisor" is a family law practitioner and the instant murder trial was "his second important criminal trial."

Immediately preceding the formal closing of the evidence in the guilt/innocence stage, the court conducted a hearing out of the jury's presence to determine defense counsel's qualifications. After finding that counsel was a qualified law student, the court questioned Appellant determining that Appellant was aware that he was being represented by a law student and that he was completely satisfied with the representation he had received to that point in the trial. The court then approved of the student's representation finding "that he's

conducted himself in a reasonable manner[.]" Our review of the record suggests otherwise. While there is nothing wrong, inherently or under the rules, with a "qualified law student" representing the accused in a murder trial, the probabilities of the accused being denied a fair trial because of ineffective assistance of counsel are greatly enhanced.

Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, (1984), the Supreme Court held that an accused is only entitled to receive reasonably effective assistance of counsel. "This right does not mean errorless counsel or counsel whose competency is judged by hindsight." *Stafford v. State,* 813 S.W.2d 503, 506 (Tex.Crim.App.1991). Under *Strickland,* the defendant must show first, that his counsel's performance was deficient, and second, that the counsel's errors were so serious that the defendant was deprived of a fair trial, meaning a trial whose result is reliable. When assessing a trial counsel's performance, every effort must be made to eliminate an evaluation based on hindsight. Because of the difficulties in making a proper evaluation, there is a strong presumption that a counsel's performance falls within a wide range of what may well be considered sound trial strategy. *Strickland.* In this case, Counsel's errors of omission and commission are so numerous from voir dire through closing argument as to defy any conception of "sound trial strategy." Without deciding whether the Appellant was in this case deprived of effective assistance of counsel, we would merely suggest that it was not in the best interest of the administration of justice for a law student to act or be allowed to act as solo or even as lead counsel in the trial of a criminal case, particularly one involving the murder of a child where the evidence is circumstantial, the issues complex and the atmosphere emotionally charged.

Having sustained the first point of error, the judgment of the trial court is reversed. Because the conviction was based upon insufficient evidence, we are required to enter an order of acquittal. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1, (1978).