NUMBER 13-05-371-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


ESTEBAN TREVINO VILLEGAS, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the 92nd District Court of Hidalgo County, Texas.

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Garza and Vela


Memorandum Opinion by Justice Garza


 

 A jury convicted appellant, Esteban Trevino Villegas, of capital murder of a child. 
Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2003), § 19.03 (Vernon Supp. 2007). The
trial court assessed an automatic life sentence. Id. § 12.31(b). On appeal, appellant raises
eleven issues, which, for purposes of organization, will be reordered, addressed as five,
and referred to numerically as follows: (1) the evidence was legally insufficient to support
a capital murder conviction; (2) the evidence was factually insufficient to support a capital
murder conviction; (3) the trial court erred in denying appellant's motion for new trial based
on newly discovered evidence and "in the interest of justice;" (4) the trial court abused its
discretion in denying a new trial based upon the State's alleged withholding of material,
exculpatory evidence; and (5) the State made inappropriate comments during closing
arguments that improperly shifted the burden of proof to appellant, which constituted
reversible error. We affirm.

I. Factual and Procedural Background

 On November 12, 2003, appellant's ten-week-old son, Alexander Noah Villegas
("Alex") stopped breathing while he was in appellant's sole care. Appellant reported that
he had fed Alex at 11:00 a.m., Alex's usual meal time. Subsequently, appellant put Alex
down for a nap and then discovered that Alex had stopped breathing at about 1:00 p.m. 
Alex was rushed to McAllen Medical Center, where doctors discovered that he had a large
skull fracture and intracranial bleeding that had caused massive brain swelling. In addition,
doctors found that Alex had twelve fractured ribs in various stages of healing, a fractured
right arm bone, and fractures to both of his thigh bones.

 Doctors conducted CT scans of Alex and found that he was brain dead. 
Furthermore, doctors reviewed the CT scans, other medical records, and appellant's
statement that Alex was normal when he fed Alex at 11:00 a.m. and determined that the
cause of Alex's injuries was child abuse, specifically shaken baby syndrome ("SBS") or
shaken impact syndrome ("SIS"). 

 In light of this information, appellant and his wife demanded a second opinion from
Driscoll Children's Hospital ("Driscoll") in Corpus Christi. Doctors at Driscoll came to the
same conclusion that Alex had been abused and that the abuse was the cause of his
injuries. On November 15, 2003, Alex was pronounced dead. The Nueces County
medical examiner concluded that Alex's cause of death was homicide by SBS or SIS. 

 On March 4, 2004, appellant was charged by indictment with one count of capital
murder stemming from the death of his infant son, Alex. Tex. Penal Code Ann. §
19.02(b)(1), § 19.03(a)(8). On October 4, 2004, appellant filed a "MOTION TO PRODUCE
EXCULPATORY AND MITIGATING EVIDENCE" pursuant to Brady v. Maryland, 373 U.S.
83 (1963). Subsequently, appellant pleaded not guilty to the crime alleged and proceeded
to trial by jury in the 92nd District Court of Hidalgo County. 

 Trial commenced on January 17, 2005. At trial, the State's evidence demonstrated 
that Alex was normal and healthy until appellant was forced to miss his college classes for
a fourth day in a row to babysit Alex on November 12, 2003. The State presented expert
testimony from Alex's pediatrician--Jorge Kutagata, M.D., the obstetrician who delivered
Alex--Mitchell Hughston, M.D., two pediatric intensive care physicians--Krishna Turlipati,
M.D. and Karl Serrao, M.D., a pediatric resident--Beth Treviño, M.D., a pediatric
neurologist--Wilson Sy, M.D., and the Nueces County medical examiner--Ray Fernandez,
M.D., demonstrating that Alex's injuries could have only been caused by vigorous shaking
and blunt force trauma to his head when left alone with appellant. Appellant presented two
expert witnesses, his wife's current obstetrician/gynecologist--Ruben Martinez, M.D.--and
an internist--Jerry Bush, M.D. Appellant also presented the testimony of Alex's mother,
Ana Moya. All of appellant's witnesses testified that Alex's injuries were due to "acute
infantile scurvy" or vitamin C deficiency.

 The jury found appellant guilty of capital murder; however, the State did not seek
the death penalty. On February 9, 2005, appellant received the automatic sentence of life
imprisonment. Subsequently, on March 10, 2005, appellant filed a motion for new trial with
the trial court based upon newly discovered evidence regarding Dr. Cesar Costa-Luna's
expert opinion that the date of occurrence of Alex's linear skull fracture cannot be
determined unless a microscopic slide examination is performed. Appellant's motion also
complained of the failure of the State to disclose exculpatory evidence pertaining to
statements made by Anastasio Farias, an employee of Pro Medic EMS and a prosecution
witness, that were allegedly favorable to appellant. 

 On March 11, 2005, appellant filed an amended motion for new trial reasserting the
contentions he raised in his original motion for new trial and alleging that the jury's verdict
does not comply with rule 21.3(c) of the Texas Rules of Appellate Procedure. (1) See Tex.
R. App. P. 21.3(c) (requiring the trial court to grant a defendant a new trial "when the verdict
has been decided by lot or in any manner other than a fair expression of the juror's
opinion"). On April 21, 2005, the State filed a motion to strike the juror affidavits appellant
relied upon in his amended motion for new trial. The trial court subsequently granted the
State's motion to strike. (2) After a hearing, the trial court denied appellant's original and
amended motions for new trial on April 25, 2005. (3) This appeal ensued.

II. Analysis

1. Legal Sufficiency of Appellant's Capital Murder Conviction 

 By his first issue, appellant contends that the evidence supporting his capital murder
conviction is neither legally nor factually sufficient. In support of this contention, appellant
argues that: (1) the fact that the evidence tended to show that appellant was the last
person to be seen with the child is insufficient to sustain the conviction and (2) newly
discovered expert, Dr. Costa-Luna, opined that the fracture Alex sustained could not be
dated without a microscopic examination, and testimony from other physicians regarding
the fracture is mere speculation and therefore unreliable. Conversely, the State contends
that: (1) appellant has provided "numerous highly improbable explanations of his son's
injuries;" (2) appellant waived any objection to the reliability of the State's expert witnesses;
and (3) the State was not required to perform any particular scientific test to properly
establish causation.

 a. Standard of Review

 In a legal sufficiency review, we view the evidence in the light most favorable to the
prosecution to determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307,
318-19 (1979); Watson v. State, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006). The trier
of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given
to testimony. See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Jackson, 443
U.S. at 318-39; Beckham v. State, 29 S.W.3d 148, 151 (Tex. App.-Houston [14th Dist.]
2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, whether
circumstantial or direct, nor do we substitute our own judgment for that of the trier of fact. 
Mosley v. State, 141 S.W.3d 816, 821 (Tex. App.-Texarkana 2004, pet. ref'd); Beckham,
29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. 
Beckham, 29 S.W.3d at 151.

 In legal sufficiency review, each fact need not point directly and independently to the
guilt of the appellant, as long as the cumulative force of all the incriminating circumstances
is sufficient to support the conviction. Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App.
2007) (citing Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); Barnes v.
State, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); Alexander v. State, 740 S.W.2d 749,
758 (Tex. Crim. App. 1987)). Circumstantial evidence is as probative as direct evidence
in establishing the guilt of an actor; circumstantial evidence alone can be sufficient to
establish guilt. Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). On appeal,
both circumstantial and direct evidence cases are examined using the same standard of
review. Id.

 We measure the sufficiency of the evidence by the elements of the offense as
defined by the hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002,
pet. ref'd). "Such a charge would accurately set out the law, would be authorized by the
indictment, and would not unnecessarily increase the State's burden of proof." Malik, 953
S.W.2d at 240. The elements of the charged offense in this case are: (1) appellant
intentionally or knowingly caused the death of an individual; and (2) the individual was
under six years of age. See Tex. Penal Code Ann. § 19.02(b)(1), § 19.03(a)(8). A
successful legal sufficiency challenge will result in the rendition of an acquittal by the
reviewing court. Adi, 94 S.W.3d at 128 (citing Tibbs v. Florida, 457 U.S. 31, 41-42 (1982)). 

 b. Discussion

 In his first sub-issue, appellant argues that the State's evidence was legally
insufficient as to identity. In support of his contention, appellant cites to a litany of cases
and compares the strength of evidence and the outcomes in those cases with the evidence
presented at trial and offers alternative explanations for Alex's cause of death. (4) Appellant testified at trial and noted on several occasions that Alex was fine at 11:00
a.m. It is undisputed that Alex was unconscious and not breathing at 1:00 p.m. the same
day. The evidence demonstrated that appellant was the only person with Alex from the
time period of 11:00 a.m. to 1:00 p.m. on November 12, 2003. Since Alex's death,
appellant has claimed he did not hurt Alex and offered a myriad of explanations for Alex's
injuries: that four nurses pushed on his wife's stomach during Alex's birth; that his wife
was denied a C-section; that his wife's friend had a baby who had stopped breathing in the
care of the same obstetrician; and that his wife was told that she could not have children
because "they would not live." Then, at trial, appellant contended that Alex, who weighed
over 11 pounds at ten weeks of age and who was fed vitamin-C-enriched infant formula,
had a vitamin C deficiency that caused him to sustain a fatal massive skull fracture and
brain bleeding, as well as fifteen different bone fractures. (5) At no time did appellant claim
that another person was present and could have caused the injuries Alex sustained or that
he was not entrusted with babysitting Alex on November 12, 2003. The jury, being the sole
judge of credibility of the witnesses, was free to accept or reject the evidence before it, and
in doing so, concluded that it was appellant who intentionally murdered Alex. See Trevino
v. State, 228 S.W.3d 729, 738 (Tex. App.-Corpus Christi 2006, pet. ref'd) (citing Earls v.
State, 707 S.W.2d 82, 85 (Tex. Crim. App. 1985)). Considering appellant was the only
person with Alex during the relevant time period, we conclude that the evidence is legally
sufficient as to the issue of identity. See Earls, 707 S.W.2d at 85 ("Evidence as to the
identity of the perpetrator of an offense can be proved by direct or circumstantial
evidence."). We further conclude that it was not incumbent upon the State to exclude all
other reasonable hypotheses. See Guevara, 152 S.W.3d at 49 (applying the same
standard of review for direct and circumstantial evidence cases).

 In his second sub-issue, appellant contends that the testimony from the State's
expert witnesses regarding the dating of Alex's skull fracture is mere speculation and
therefore unreliable in light of Dr. Costa-Luna's affidavit testimony. Specifically, appellant
notes that "[t]he testimony of Doctors Turlipati, Serrao, Sy, and Fernandez amounts to
mere speculation about the date and time of the [skull] fracture, since none of them did a
microscopic examination of the fracture and none of them did a microscopic examination
of the skull." Appellant also argues that the State's evidence was "scientifically unreliable."
We construe this sub-issue as a challenge to the legal sufficiency of the State's evidence
on causation.

 The admission of expert testimony lies within the sound discretion of the trial court
and will not be set aside absent a showing of an abuse of that discretion. Joiner v. State,
825 S.W.2d 701, 708 (Tex. Crim. App. 1992). Rule 702 of the Texas Rules of Evidence
governs the admission of all expert testimony. See Tex. R. Evid. 702; see also Kelly v.
State, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). Rule 702 provides:

 If scientific, technical, or other specialized knowledge will assist the trier of
fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or education
may testify thereto in the form of an opinion or otherwise.


Tex. R. Evid. 702.


 The trial court, before admitting expert testimony, must be satisfied that three
conditions are met: (1) that the witness qualifies as an expert by reason of his knowledge,
skill, experience, training, or education; (2) that the subject matter of the testimony is an
appropriate one for expert testimony; and (3) that admitting the expert testimony will
actually assist the fact-finder in deciding the case. Alvarado v. State, 912 S.W.2d 199,
215-16 (Tex. Crim. App. 1995). However, the "threshold determination" for a trial court to
make regarding the admission of expert testimony is whether the testimony will help the
jury understand the evidence or determine a fact in issue. See Kelly, 824 S.W.2d at 572. 
"Unreliable . . . scientific evidence simply will not assist the [jury] to understand the
evidence or accurately determine a fact in issue; such evidence obfuscates rather than
leads to an intelligent evaluation of the facts." Id. (quoting K. Kreiling, Scientific Evidence: 
Toward Providing the Lay Trier With the Comprehensible and Reliable Evidence
Necessary to Meet the Goals of the Rules of Evidence, 32 Ariz. L. Rev. 915, 941-42
(1990)). (6)
 

 However, in the instant case, appellant's unreliability argument is entirely premised
on his assertion that the State's medical experts did not conduct a microscopic examination
of Alex's skull and of the fracture itself. To the contrary, the record contains findings filed
by Dr. Fernandez which indicate that a microscopic examination of Alex's skull and Alex's
skull fracture was conducted on November 17, 2003. Dr. Fernandez noted the following
with respect to the microscopic examination of Alex's skull and skull fracture: 
"[e]xtravasated fresh blood." In an affidavit filed April 19, 2005, Dr. Fernandez stated: 
"The skeletal trauma of the skull fracture was examined by x-rays, gross autopsy and by
microscopic exam. The skull fracture is recent and minutes to hours old." Therefore, it is
clear from the evidence adduced at trial that a microscopic examination of Alex's skull and
skull fracture was conducted. Based in part on Dr. Fernandez's findings from the
microscopic examination of Alex's skull and skull fracture, the jury was free to conclude
that appellant, being the only person with Alex during the relevant time period, caused the
injuries Alex sustained. 

 On appeal, appellant has not attacked the method by which Dr. Fernandez
conducted the microscopic examination nor argued to the trial court that alternative
methods for conducting microscopic examinations exist or that an additional microscopic
examination would yield a different result. Instead, appellant steadfastly contends that no
microscopic examination was conducted and that because of this, the testimony of the
State's medical experts as to the date of the skull fracture was mere speculation and
therefore unreliable expert testimony. (7) Because the record reflects that a microscopic
examination was conducted, Dr. Fernandez's findings helped establish the date of the
injury, and appellant did not dispute the method by which Dr. Fernandez conducted the
microscopic examination, we conclude that the evidence is legally sufficient as to the issue
of causation. (8) 

 Because we have concluded that (1) the evidence was legally sufficient as to identity
and the State was not required to exclude all reasonable hypotheses and (2) the evidence
is legally sufficient as to the issue of causation, we overrule appellant's first issue.

2. Factual Sufficiency

 In his second issue, appellant asserts that the evidence is factually insufficient to
sustain his conviction. Specifically, appellant notes "[i]n [this case] the evidence is factually
insufficient because the testimony of Doctors Turlipati, Sy, Fernandez, and Serrao is
unscientific for failure to follow professional norms . . . . It is overcome by the testimony
of Drs. Bush and Costa-Luna and the professional literature and the complete failure of the
[S]tate to prove any motive for a father to kill his own son." Conversely, the State contends
that (1) it was not required to prove motive, (2) appellant's own expert witness testified that
Alex's injuries could not have been sustained during birth, (3) the jury is permitted to make
reasonable inferences and to "stack" inferences, and (4) despite some conflicting evidence
in the record, the jury's verdict is not against the "great weight and preponderance of the
evidence." 

a. Standard of Review

 In a factual sufficiency review, we review the evidence in a neutral light to determine
whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly
unjust. Watson, 204 S.W.3d at 414-15. After considering all of the evidence in the record
related to appellant's sufficiency challenge, we compare the evidence weighed by the jury
that tends to prove the elemental fact in dispute with the evidence that tends to disprove
it. Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997) (en banc). This Court
will not reverse the jury's verdict unless we can say with some objective basis in the record
that the great weight and preponderance of the evidence contradicts the verdict. Watson,
204 S.W.3d at 415.

b. Discussion

 We begin this section by addressing appellant's contention that the evidence was 
factually insufficient to support his conviction because the State failed to prove motive
beyond a reasonable doubt. However, the court of criminal appeals has held that proof of
motive is not required to sustain a conviction for capital murder. See Vuong v. State, 830
S.W.2d 929, 934 (Tex. Crim. App. 1992) ("Finally, we note that it is not required that the
State show a motive in order to sustain a conviction of capital murder.") (citing Garcia v.
State, 495 S.W.2d 257, 259 (Tex. Crim. App. 1973)). Therefore, appellant's contention
that the State failed to prove motive beyond a reasonable doubt does not render the
evidence factually insufficient to sustain his conviction.

 Appellant also argues that the State's "proof is stacked inferences and
unreasonable inferences: 'The dad was the last one seen with the child, the child had
some fractures that could have been from birth trauma or could have been from vitamin
deficiency, the bleeding could have been from the vitamin deficiency, but the mom and dad
were apart and perhaps estranged, so the dad must have killed the baby.'" (9)

 We will first address appellant's contention that the jury impermissibly "stacked
inferences." The court of criminal appeals has recently opined on the issue of "stacked
inferences," but in the context of legal sufficiency review. In Hooper v. State, the court
noted that:

 In the context of modern criminal law, a rule against inference
stacking is unnecessary. . . . [W]e permit juries to draw multiple reasonable
inferences as long as each inference is supported by the evidence presented
at trial. However, juries are not permitted to come to conclusions based on
mere speculation or factually unsupported inferences or presumptions. . . . 
A presumption is a legal reference that a fact exists if the facts giving rise to
the presumption are proven beyond a reasonable doubt. . . . A jury may find
that the element of the offense sought to be presumed exists, but it is not
bound to find so. In contrast, an inference is a conclusion reached by
considering other facts and deducing a logical consequence from them. 
Speculation is mere theorizing or guessing about the possible meaning of
facts and evidence presented. A conclusion reached by speculation may not
be completely unreasonable, but it is not sufficiently based on facts or
evidence to support a finding beyond a reasonable doubt.

 As stated above, juries are permitted to draw multiple reasonable
inferences from the evidence (direct or circumstantial), but they are not
permitted to draw conclusions based on speculation. 


214 S.W.3d 9, 15-16 (Tex. Crim. App. 2007) (citations omitted). Based on our review of
Texas case law, the court of criminal appeals has not applied the Hooper reasoning
pertaining to "stacked inferences" to factual sufficiency review. However, we need not
"stack" inferences in the instant case to conclude that the evidence is factually sufficient
to support the jury's verdict.

 i. Appellant's Witnesses

 The record contains testimony from appellant's own expert witness, Dr. Martinez,
that Alex's injuries were not caused by a difficult delivery. Specifically, Dr. Martinez noted:

 Q: Doctor, if you would--did you see the records of--the delivery
records?


 A: Yes, I reviewed them front to back.


 Q: Okay. Did you see the records of Baby Alex?


 A: The baby was born perfectly fine. He had excellent Apgars. His pH,
that is when we measure acidity in the blood in [sic] the newborn, was
normal. The baby had--it was a difficult delivery, but the baby came
out fine.


 . . . .


 Q: So we can eliminate birth trauma?


 A: Absolutely, and I eliminated it.


The State's expert witnesses agreed with Dr. Martinez's assessment that Alex did not
sustain injuries during delivery. (10) Dr. Martinez further noted that he believed Alex died from
acute neonatal vitamin C deficiency secondary to vaccination. (11) 

 Dr. Bush testified that Alex's injuries were probably caused by a vitamin C
deficiency. However, Dr. Bush admitted that he had only been involved with one shaken
baby syndrome case during his rotations in the mid-1980's and testified that a vitamin C
deficiency does not result in a skull fracture. Dr. Bush also recognized that although he
believes that Alex's injuries were caused by a vitamin C deficiency, there could be "other
possibilities" as to the cause of those injuries. In addition, Dr. Bush testified that it takes
six to twenty-four months for chronic infantile scurvy (Barlow's disease) to develop even
though Alex was only ten weeks old at the time of his death. On the other hand, Dr. Bush
noted that acute infantile scurvy can occur in infants much younger than six months. (12) Dr.
Bush further testified that the bones of children diagnosed with vitamin C deficiency are
thin. Dr. Bush admitted that he did not personally examine the bones of Alex to determine
if Alex's bones were thin. 

 Moya, appellant's wife, also testified on behalf of appellant. Moya noted that Alex
did not like the Infamil formula that he was being fed and that he was fussy and colicky
about 50% to 75% of the time. Moya offered numerous explanations and excuses for
Alex's injuries, including a difficult delivery where four nurses pushed on her stomach and
Dr. Hughston denied her a C-section, Dr. Kutagata allegedly lied about appellant stating
that Alex suffered a bruised eye because he hit his head on the table, Alex had problems
since birth that Dr. Kutagata did not document, Dr. Kutagata allegedly did not do his job
well, and Dr. Serrao did not do all the tests she requested. Moya further testified that
appellant attended college classes on Mondays, Wednesdays, and Fridays and for two
hours on Tuesdays and Thursdays. Moya noted that her mother usually watched Alex
while appellant was in school and she was at work. (13)

 ii. The State's Witnesses

 Dr. Fernandez testified that Alex's bones were not thin and were not vitamin C
deficient based upon the results of his autopsy of Alex's body. Dr. Fernandez also testified
that Alex weighed ten pounds at the time of the autopsy, which represented an increase
in Alex's weight from 6.6 pounds when Dr. Serrao examined Alex at Driscoll. Dr. Kutagata,
Alex's pediatrician, testified that the symptoms of juvenile scurvy are bleeding, swelling, a
purplish color, fragility, pain mainly in the legs, lack of healing, and lesions and fractures;
mainly in the long bones and wrists, but skull fractures are rarely seen. Dr. Kutagata also
testified that very few American children have Barlow's disease because most infant
formulas contain vitamin C. Dr. Kutagata further testified that vaccines do not cause
vitamin C deficiency and that Alex's injuries are not consistent with vitamin C deficiency
because vitamin C is needed for healing and Alex had many rib fractures in different
stages of healing. Dr. Kutagata noted that Alex was not vitamin K deficient because he
received a vitamin K shot just after birth and had not bled profusely when he was
circumcised. Finally, Dr. Kutagata recalled an instance on November 4, 2003, when Alex's
grandparents brought Alex in complaining that he was fussy, irritable, had a runny nose,
a loss of appetite, and was vomiting. Dr. Kutagata noticed a thin bruise under Alex's left
eye and asked how it happened. Dr. Kutagata testified that Alex's grandmother replied that
she did not know how it happened but "it's not what you're thinking." Appellant called later
to explain that Alex had "bobbed" and hit his eye on the table. 

 Dr. Treviño testified that she had interviewed appellant and that he disclosed to her
that Alex fed well and was on Infamil formula, which contained all the necessary vitamins,
including vitamin C. Dr. Treviño's testimony revealed that "[t]he recommended daily
allowance for vitamin C in infants zero to six months is anywhere from the 38 to 48
milligrams per day. And this child was receiving the proper amount of vitamin C daily." Dr.
Treviño noted earlier that Alex was being fed two to three ounces of Infamil every three
hours and Infamil has "2.4 milligrams of vitamin C per ounce." 

 Dr. Turlipati, the pediatric intensive care doctor who treated Alex at McAllen Medical
Center, testified that he also interviewed appellant who disclosed to him that Alex was
feeding well about two hours prior to his death. Dr. Turlipati also testified as to SBS/SIS. 
Dr. Turlipati noted that there was bleeding that was very recent around the skull fracture
Alex sustained. He also testified that Alex exhibited numerous other physical indications
of SBS/SIS, including blood along the tentorium of the cerebellum and the interhemispheric
fissure, a subdural hematoma, and flame-shaped retinal hemorrhages. Based on his
experience, Dr. Turlipati testified that SBS/SIS usually occurs when a care giver becomes
frustrated with a baby who will not stop crying. (14) Dr. Turlipati also commented on Alex's
rib fractures, noting that some of the fractures were at least two weeks old, which indicated
to him that Alex had been abused in the past. Dr. Turlipati testified that someone had
squeezed Alex and fractured his ribs, which would have caused him to be cranky, to vomit,
and to have bowel movement problems because he was in pain. Dr. Turlipati also testified
that Alex was fed baby formula and that vitamin C deficiency was not the cause of Alex's
injuries. Finally, Dr. Turlipati stressed the importance of the child's history in establishing
child abuse. Dr. Turlipati noted that the family never made a report of an accidental fall
and the family had no explanation for Alex's injuries at the time he examined Alex. 

 Dr. Sy, the pediatric neurologist who also treated Alex at McAllen Medical Center
testified that he conducted tests on Alex when he was in a deep coma and very close to
brain dead. Dr. Sy testified that Alex's injuries were very severe and required "a lot of
force, a lot of shaking." Dr. Sy noted that the bleeding in Alex's brain was consistent with
SBS/SIS and that child abuse was very high on his list of possibilities.

 Dr. Serrao, the pediatric intensive care doctor who treated Alex at Driscoll, testified
that based on his examination of Alex, it was clear to him that Alex's head hit a blunt object
like a wall or mattress. Dr. Serrao further testified that Alex suffered a closed head injury
due to non-accidental trauma. Dr. Serrao concluded that Alex died of SBS/SIS and the
shaking occurred on November 12th. Finally, Dr. Serrao noted that Alex's fractures could
not have been caused by his delivery, CPR, someone running with him, or a vitamin C
deficiency; he was murdered.

 Based on the foregoing, we conclude that no "stacked inferences" were necessary
to support appellant's conviction. It was undisputed at trial that appellant was the sole care
giver of Alex during the relevant time. Furthermore, the evidence demonstrates that Alex's
injuries were not from birth trauma and most likely not the result of a vitamin C or K
deficiency. In fact, Dr. Kutagata, Dr. Turlipati, Dr. Serrao, Dr. Sy, and Dr. Fernandez all
testified that Alex's injuries were not caused by a vitamin C deficiency, but by intentional
child abuse. It is clear from our review of the record that the jury was reasonable in
concluding that Alex's injuries were the result of SBS/SIS, especially in light of the State's
expert witnesses. See Watson, 204 S.W.3d at 414-15 (noting that we only reverse a jury's
verdict if the verdict is manifestly unjust or clearly wrong). Therefore, the jury needed only
to infer that appellant must have killed Alex given the fact that he was the sole care giver
of Alex during the relevant time period and that Alex's injuries were most likely caused by
SBS/SIS while appellant served as Alex's sole care giver. As such, only one inference was
needed. We further conclude that the evidence adduced at trial was factually sufficient to
support the jury's verdict. Accordingly, we overrule appellant's second issue.

3. Motion for New Trial Based on Newly Discovered Evidence and "In the Interest of
Justice"

 

 In his third issue, appellant asserts that he is entitled to a new trial because he has
discovered Dr. Costa-Luna who will testify that the date of occurrence of the linear fracture
on Alex's skull cannot be determined unless a microscopic slide examination is performed. 
Appellant further asserts that no microscopic slide examination was conducted and that
the State's expert witnesses merely speculated on the date of the occurrence of the skull
fracture, which resulted in an unreliable jury verdict. Appellant also contends that certain
jurors were pressured by other jurors to return a guilty verdict, thus also resulting in an
unreliable jury verdict. The State counters by arguing that appellant has not presented an
issue for appeal with respect to this issue. The State further argues that Dr. Costa-Luna's
testimony was adduced at the motion for new trial hearing and that his testimony is merely
collateral of impeaching evidence and would not yield a different result in another trial. 
With respect to appellant's contention that the trial court should have granted his motion
for new trial "in the interest of justice," the State contends that the issue has not been
preserved for appeal and that appellant has failed to demonstrate that the jury's verdict
was unreliable.


 a. Applicable Law 

 Article 40.001 of the Texas Code of Criminal Procedure provides "[a] new trial shall
be granted an accused where material evidence favorable to the accused has been
discovered since trial." Tex. Code Crim. Proc. Ann. art. 40.001 (Vernon 2006). However,
a trial court has discretion to decide whether to grant a new trial based upon newly
discovered evidence, and its ruling will not be reversed absent an abuse of discretion. See
Keeter v. State, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002). We do not substitute our
judgment for that of the trial court, but rather decide whether the trial court's decision was
arbitrary or unreasonable. See Lewis v. State, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). 
A party seeking a new trial on the ground of newly discovered evidence must show (1) the
newly discovered evidence was unknown or unavailable to the movant at the time of his
trial, (2) the movant's failure to discover or obtain the evidence was not due to a lack of
diligence, (3) the new evidence is admissible and is not merely cumulative, corroborative,
collateral, or impeaching, and (4) the new evidence is probably true and will probably bring
about a different result on another trial. Keeter, 74 S.W.3d at 36-37.

 b. Discussion

 In his original and amended motions for new trial, appellant included an affidavit of
Dr. Costa-Luna detailing his opinions on the medical testimony and analysis provided by
Drs. Turlipati, Serrao, Sy, and Fernandez. In his affidavit, Dr. Costa-Luna provides:

 In this case, no tests were conducted by any of the doctors to date the
skull fracture from a few minutes to two hours.

 

 I have been involved in many cases involving child abuse, allegations
of shaken baby and shaken impact syndrome, and cases involving linear
skull fractures. Without detailed medical microscopic examinations of the
fracture and the skull it is not possible with reasonable medical probability to
date a linear skull fracture. To date the linear skull fracture without the
microscopic examination of the fracture and the skull by the pathologist
would involve nothing more than speculation as to when the fracture
occurred.


 In a case like the one involving Baby Alex Villegas, the only way to
accurately date the linear skull fracture is to exhume the body and have a
pathologist use microscopic slides of the fractured skull to be able to date the
linear skull fracture.


In his amended motion for new trial, appellant states that "[he] used due diligence in
preparing for this trial but was unable to discover the existence of this expert." Appellant
also contended that "[t]he materiality of this evidence is such as would probably bring about
a different result in another trial" and that "[s]uch evidence is admissible and not
cumulative, corroborative, collateral, or impeaching." 

 However, in its response to appellant's amended motion for new trial, the State
reintroduced the investigative report and autopsy findings filed by Dr. Fernandez
demonstrating that a microscopic examination was conducted on Alex's skull fracture. In
his report, Dr. Fernandez made the following notes: "[e]xtravasted fresh blood." Dr.
Fernandez also conducted microscopic examinations of Alex's brain, bones, lungs, and
gastrointestinal tract. The State also provided an affidavit from Dr. Fernandez that stated
the following:


 It is my opinion that Alexander N. Villegas died from Shaken Impact
Syndrome. The conclusion is based on the Medical [sic] records and
autopsy findings.

 

 The skeletal trauma of the skull fracture was examined by x-rays,
gross autopsy and by microscopic exam. The skull fracture is recent and
minutes to hours old.


The record also contains Dr. Turlipati's testimony in which he notes the following:


 Q: This skull fracture, is it an old skull fracture or a new--a fresh one?

 

 A: It had to have occurred--if I'm just looking at the skull fracture and
nothing--not involving other findings in the scan, it could be a week
or two.

 

 Q: Now, when you look at all the findings--

 

 A: It's recent.

 

 Q: And how recent?

 

 A: It could have been within hours to a day.

 

 Q: Within one hour?

 

 A: Yes.

 

 Q: Or a what?

 

 A: Or a day.


 Additionally, the State directs us to the following testimony of Dr. Serrao to support
its contention that Alex's skull fracture occurred on November 12th:

 Q: (By Mr. Almaguer) Okay. Doctor, can you tell us whether this fracture
[the skull fracture] was a fresh fracture or an old fracture?

 

 A: It was relatively recent, yes.

 

 Q: Okay. And what do you mean by recent, Doctor, can you tell us a
little bit about the timing of the fracture in relation to the day of the
incident, 11/12?

 

 A: . . . [B]ecause I saw him on the 15th and he presented on the 12th,
then that fracture was anywhere between three to seven days old,
based on just radiologically, just talking about the fracture by itself
without looking at all the other circumstances.

 

 Q: Now, when you look at all the other circumstances, tell us a little bit
about the timing.


 A: This baby received major injuries--his major injuries on the morning
of the 12th, November 12th, 2003.


 It is clear from our review of the record that appellant has failed to establish the first
two prongs of the relevant inquiry: (1) that the newly discovered evidence was unknown
or unavailable to appellant at the time of his trial and (2) that appellant's failure to discover
or obtain the evidence was not due to a lack of diligence. See Keeter, 74 S.W.3d at 36-37. 
In fact, appellant has merely made bald assertions in his amended motion for new trial that
the information was unknown to him prior to trial and that the failure to discover the
evidence was not due to a lack of due diligence. We have not found anything in the
record supporting appellant's assertions. In any event, Dr. Costa-Luna's affidavits are
impeaching of the prior testimony of Dr. Turlipati and Dr. Serrao and the affidavit and
investigative reports compiled by Dr. Fernandez. As a result of the impeaching nature of
Dr. Costa-Luna's affidavits, we conclude that appellant has failed to establish that this
newly discovered evidence would result in a different outcome; thus, appellant would not
be entitled to a new trial based on the testimony of Dr. Costa-Luna. 

 Appellant has also taken issue with the reliability of the jury verdict as it relates to
the alleged pressuring of certain jurors to return guilty verdicts. See Tex. R. App. P. 21.3(c). 
In his original motion for new trial, appellant attached an affidavit from Thelma Quintanilla
who alleged that she was pressured to change her vote to guilty and that two other
undecided jurors were pressured to change their votes to guilty. Quintanilla further alleged
that "I believe that if I had continued with my not guilty verdict, they also would have
continued with their undecided verdict." (15) We construe this as a complaint pertaining to
juror misconduct.

 Rule 21.3(c) provides that:

 The defendant must be granted a new trial, or a new trial on punishment, for
any of the following reasons:

 

 . . . .

 

 (c) when the verdict has been decided by lot or in any manner other
than a fair expression of the juror's opinion;


Tex. R. App. P. 21.3(c). However, the testimony of jurors is limited by rule 606 of the Texas
Rules of Evidence. See Tex. R. Evid. 606(b). Specifically, rule 606(b) provides:

 (b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the
validity of a verdict or indictment, a juror may not testify as to any matter or
statement occurring during the jury's deliberations, or to the effect of
anything on any juror's mind or emotions or mental processes, as influencing
any juror's assent to or dissent from the verdict or indictment. Nor may a
juror's affidavit or any statement by a juror concerning any matter about
which the juror would be precluded from testifying be admitted in evidence
for any of these purposes. However, a juror may testify: (1) whether any
outside influence was improperly brought to bear upon any juror; or (2) to
rebut a claim that the juror was not qualified to serve.


Id. (16) To further examine appellant's allegation, we must briefly delve into the history of rule
606 of the rules of evidence. 

 In 1998, rule 606 of the Texas Rules of Evidence was amended when the civil and
criminal rules of evidence were consolidated. Glover v. State, 110 S.W.3d 549, 551 (Tex.
App.-Waco 2003, pet. ref'd) (citing Sanders v. State, 1 S.W.3d 885, 887 (Tex. App.-Austin
1999, no pet.); see Tex. R. Evid. 606. The amended version of rule 606 deleted the part
of the old criminal rule which allowed jurors to testify about anything relevant to the validity
of the verdict or indictment. Sanders, 1 S.W.3d at 887; see Tex. R. Evid. 606. The
purpose of the amended version of rule 606 was to preserve the confidentiality of jury
deliberations to ensure that no outside influence and pressure is brought to bear on the
jury so that deliberations may be free, independent, and frank. (17) See State ex rel.
Rosenthal v. Poe, 98 S.W.3d 194, 201-02 (Tex. Crim. App. 2003); see also Tex. R. Evid.
606. 

 Quintanilla's affidavit fails to establish (1) that an outside influence was improperly
brought to bear upon any juror or (2) that a juror was not qualified to serve. See Tex. R.
Evid. 606(b). As such, rule 606(b) of the Texas Rules of Evidence bars Quintanilla from
testifying about what happened during jury deliberations. See id. (18) We therefore conclude
that the trial court did not err in granting the State's motion to strike appellant's juror
affidavits in support of his amended motion for new trial. Because appellant has not
provided testimony from a non-juror to establish the unreliability of the jury's verdict and
possible juror misconduct, we further conclude that appellant is not entitled to a new trial
"in the interest of justice." Accordingly, we overrule appellant's third issue.


4. Exculpatory Evidence

 In his fourth issue, appellant contends that the trial court abused its discretion in
overruling his motion for new trial on the basis of the State's alleged failure to disclose
exculpatory evidence. Specifically, appellant argues that the State "failed to disclose that
Mr. Anastasio Farias, the Pro Medic EMS prosecution witness had provided statement [sic]
to him that were favorable to the Defendant." Appellant notes that "[t]he jury should have
heard from a medical professional that the dad [appellant] was in shock when the medic
arrived shortly after the baby's death. The medic could have explained what shock is and
the lawyer could have then argued that one in shock could not have killed his own son." 
The State counters by arguing that such information was fully accessible to appellant from
other sources. The State further argues that the trial court implicitly found that the State
did not suppress this evidence, the evidence was not favorable to appellant, and the
evidence was not material. In addition, the State asserts that Farias' subjective opinions
were inadmissible at trial, the same evidence was introduced at trial through Farias and
other witnesses, and the alleged withheld evidence is very weak when balanced against
the evidence supporting the conviction.


 a. Applicable Law

 Again, the granting or denying of a motion for new trial lies within the discretion of 

the trial court. See Lewis v. State, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). We do not
substitute our judgment for that of the trial court, but rather decide whether the trial court's
decision was arbitrary or unreasonable. See id. 

 In accordance with the United States Supreme Court's holding in Brady, the State
is required to provide potentially exculpatory information to the defense. 373 U.S. at 87;
see Thomas v. State, 841 S.W.2d 399, 402 & n.5 (Tex. Crim. App. 1992); see also Sierra
v. State, No. 13-05-769-CR, 2007 Tex. App. LEXIS 6303, at **18-20 (Tex. App.-Corpus
Christi Aug. 9, 2007, no pet.) (mem. op., not designated for publication). The Due Process
Clause of the Fourteenth Amendment of the United States Constitution is violated when
the State fails to disclose evidence which is favorable to the accused and that creates a
probability sufficient to undermine the confidence in the outcome of the proceedings. See
Thomas, 841 S.W.2d at 404; State v. Blanco, 953 S.W.2d 799, 802 (Tex. App.-Corpus
Christi 1997, pet. ref'd) ("A defendant's due process right to a fair trial is violated when the
State withholds evidence that is both material and favorable to the accused irrespective of
the good faith or bad faith of the prosecution"); see also U.S. Const. amend. XIV. 
Impeachment evidence, as well as exculpatory evidence, is included within the scope of
the Brady rule. See Wyatt v. State, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) (citing U.S.
v. Bagley, 473 U.S. 667, 676 (1985)). Further, the information must be disclosed to the
accused in time to put it to effective use at trial. See Palmer v. State, 902 S.W.2d 561, 563
(Tex. App.-Houston [1st Dist.] 1995, no pet.). This includes disclosure of any favorable
information in the possession of police agencies or other parts of the "prosecutorial team." 
Ex parte Mitchell, 977 S.W.2d 575, 578 (Tex. Crim. App. 1998) (citing Kyles v. Whitley, 514
U.S. 419, 435 (1995)). A reasonable probability of a different result is shown when the
government's evidentiary suppression undermines confidence in the outcome of the trial. 
Kyles, 514 U.S. at 435.

 In addition, "[t]he mere possibility that an item of undisclosed information might have
helped the defense, or might have affected the outcome of the trial, does not establish
'materiality' in the constitutional sense." Hampton v. State, 86 S.W.3d 603, 612 (Tex. Crim.
App. 2002) (quoting United States v. Agurs, 427 U.S. 97, 109-10 (1976)). Rather, the
inquiry is whether the failure of the State to disclose the evidence undermines the
confidence in the jury's verdict. See Lempar v. State, 191 S.W.3d 230, 241 (Tex.
App.-San Antonio 2005, pet ref'd) (citing Ex parte Richardson, 70 S.W.3d 865, 870 n.22
(Tex. Crim. App. 2002)); see also Thomas, 841 S.W.2d at 404 ("The evidence is material
only if there is a reasonable probability that, had the evidence been disclosed to the
defense, the result of the proceeding, would have been different. A 'reasonable probability'
is a probability sufficient to undermine confidence in the outcome.").

 b. Discussion

 Appellant contends that the trial court abused its discretion in denying his motion for
new trial based upon his contention that the State failed to disclose exculpatory evidence,
specifically the affidavit of Farias, in violation of Brady. Appellant attached Farias's affidavit
to his amended motion for new trial. The affidavit provides, in relevant part: 

 6. Upon arriving at the scene, I noticed a young man there. He was
in total shock. I attended to the baby and he could not answer any of my
questions. I later found out that he was the father of the child and that his
name was Esteban Villegas.

 

 7. When we transported the child to McAllen Medical Center, Mr.
Villegas rode in the ambulance with me. I asked him questions about the
child but he would not answer. He continued in total shock as if having been
hit with a sledgehammer.

 

 8. I have attended many situations where serious injuries have
occurred to people and I have always noticed that the perpetrators are
paranoid or very nervous.

 

 9. When I spoke to Mr. Andrew Almaguer about this situation, I told
him that it was clear that Esteban Villegas was in total shock and that it was
clear he could not have been the perpetrator of this crime. I told the
prosecutor that Mr. Villegas' behavior was inconsistent with that of a guilty
person.

Appellant contends that Farias's affidavit testimony was both material and favorable to his
case.

 At the hearing on his motions for new trial, appellant presented testimony from trial
counsel, Fernando Mancias, to establish that the State withheld the alleged material and
favorable evidence in violation of Brady. In his testimony, Mancias noted the following:

 Q: Did they follow that in this case?

 

 A: I got a chance to look at the entire file--the entire file that they had on
Esteban Villegas. And I saw it two or three different times.

 

 Q: Okay. Did you look for exculpatory evidence?

 

 A: I did.

 

 Q: Did you ask for evidence which might lead to exculpatory evidence?

 

 A: We filed a motion to that effect.

 

 . . . .

 

 Q: All right. Did Mr. Almaguer [the prosecutor] give you any evidence
which he said was exculpatory?

 

 A: He gave me the entire file. And he said that's all that we have is the
entire file.

 

 Q: Did he point out any evidence that he said was exculpatory?

 

 A: No, sir.

 

 Q: Did anyone else in the prosecutor's office give you any evidence
which the person said was exculpatory?

 

 A: No, sir.

 

 . . . .

 

 Q: When did you learn of the testimony of Anastacio Farias?

 

 A: We learned about his testimony more or less about March 7th right
before the deadline to file the Motion for New Trial, March 5th and
maybe March 7th in that area.

 

 Q: Of this year?

 

 A: Of this year. Yes, sir. 2005.


 However, Farias, a designated witness for the State, testified to the following at
trial:

 Q: Do you recall this man right here in the blue?

 

 A: Yes, sir.

 

 . . . .

 

 Q: Do you recall how--what was his demeanor like?

 

 A: Quiet. I believe he went with us in the ambulance to the hospital. I
remember trying to find out a medical history, medication or allergy,
and I don't remember receiving an answer for any of those.

 

 . . . .


 Q: Was he crying?

 

 A: No, sir.


On cross examination, Farias further testified that:


 Q: And you're not saying that Mr. Villegas was unconcerned about his
baby's condition, are you?

 

 A: No, sir.

 

 Q: He could have been in shock?

 

 A: He could have been, yes, sir.


 It is clear to us that Farias's testimony regarding appellant's demeanor at the scene
of Alex's death would probably not undermine the jury's verdict. See Lempar, 191 S.W.3d
at 241. At best, Farias's affidavit would serve to impeach prior testimony that suggested
that appellant's refusal to answer questions about Alex's medical history, allergies, and
various other medical issues demonstrated that appellant did not care about the well-being
of his child. However, while it is conceivable that Farias's testimony would possibly help
the defense, appellant has failed to demonstrate that this testimony would probably lead
to a different outcome. See Wyatt, 23 S.W.3d at 27. As a result, Farias's affidavit would
not be material. See id. Moreover, this evidence would not be exculpatory because it does
not tend to clear the defendant from alleged fault or guilt. See Ex parte Mitchell, 853
S.W.2d 1, 4 (Tex. Crim. App. 1993); Thomas, 841 S.W.2d at 404 ("Exculpatory testimony
is '[testimony]' or other evidence which tends to justify, excuse or clear the defendant from
alleged fault or guilt.'") (quoting Black's Law Dictionary 566 (5th ed. 1990)). The
information contained within Farias's affidavit is materially the same as the testimony
Farias provided at trial.

 Additionally, the record reflects that Farias was made available to appellant for
cross-examination at the original trial. In fact, appellant's trial counsel specifically asked
Farias about appellant's demeanor at the scene of Alex's death, which makes it clear to
this Court that the jury was given an opportunity to consider Farias's contention that
appellant was in a state of shock during the trip to the hospital and when the ambulance
first arrived. Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (noting that the
jury, as the trier of fact, is the exclusive judge of the credibility of witnesses and the weight
to be afforded their testimony). Therefore, Farias's affidavit would be cumulative of other
evidence in the record. See Tex. R. Evid. 403 ("Although relevant, evidence may be
excluded if its probative value is substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by considerations of undue delay, or
needless presentation of cumulative evidence.") (emphasis added). (19)

 Finally, appellant is required to prove that the evidence allegedly withheld or not
disclosed in accordance with Brady resulted in harmful error to be entitled to a new trial. 
See Harm v. State, 183 S.W.3d 403, 405 (Tex. Crim. App. 2006); see also Hampton v.
State, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002); Wyatt, 23 S.W.3d at 27. Appellant has
failed to demonstrate that the alleged nondisclosure of Farias's affidavit constituted harmful
error, entitling him to relief. See Marshall v. State, 210 S.W.3d 618, 636 (Tex. Crim. App.
2006) (holding that the presentation of evidence claimed to be exculpatory can make a
Brady violation harmless, unless the defendant shows a reasonable probability that an
earlier disclosure would have made the outcome of the proceeding different); see also
Lowry v. State, No. 13-03-00081-CR, 2008 Tex. App. LEXIS 935, at *30 (Tex.
App.-Corpus Christi Feb. 7, 2008, no pet. h.).

 Based on the foregoing, we conclude that the harm appellant complains of is
harmless and did not result in an improper outcome. We therefore further conclude that
the trial court did not abuse its discretion in denying appellant's motion for new trial based
on his Brady contention. Accordingly, we overrule appellant's fourth issue.


5. Prosecutor's Comments During Closing Arguments

 In his fifth issue, appellant asserts that the prosecutor, in his closing argument,
made an inappropriate comment that "the Defense should have exhumed Baby Alex's
body." Appellant contends that this comment improperly shifts the burden of proof from
the State to the defendant and amounts to reversible error. On the other hand, the State
argues that appellant has not preserved this issue for appellate review. The State further
argues that the prosecutor's argument was neither "fundamental error" nor improper or
harmful because the comment was made in response to appellant's argument that Alex's
vitamin C deficiency caused some or all of his injuries.

 a. Applicable Law An assertion of improper jury argument requires us to review the record in its
entirety to determine whether any erroneous statements were made, and if so, whether
they were so prejudicial as to deprive appellant of a fair and impartial trial. See Willis v.
State, 785 S.W.2d 378, 385 (Tex. Crim. App. 1989); see also Cavazos v. State, No. 13-04-00325-CR, 2007 Tex. App. LEXIS 7174, at **23-26 (Tex. App.-Corpus Christi Aug. 30,
2007, pet. ref'd). There are four permissible areas of jury argument: (1) summation of the
evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing
counsel; and (4) plea for law enforcement. Wilson v. State, 938 S.W.2d 57, 59 (Tex. Crim.
App. 1988); Chavero v. State, 36 S.W.3d 688, 699 (Tex. App.-Corpus Christi 2001, no
pet.). An argument which exceeds these bounds is error, but only becomes subject to
reversal if, in light of the record as a whole, the argument is extreme or manifestly
improper, violative of a mandatory statute, or injects new facts harmful to the accused into
the trial. Felder v. State, 848 S.W.2d 85, 94-95 (Tex. Crim. App. 1992); Everett v. State,
707 S.W.2d 638, 640 (Tex. Crim. App. 1986). To determine if the prosecutor made an
improper jury argument, the reviewing court must consider the entire argument in
context--not merely isolated instances. See Rodriguez v. State, 90 S.W.3d 340, 364 (Tex.
App.-El Paso 2001, pet. ref'd).

 b. Discussion

 Appellant takes issue with the following exchange:

 [MR. ALMAGUER]: As far as infantile scurvy test, they could have done the
test. They have that technology nowadays. Well, as
they testified, Baby Alex's--we haven't had closure,
then why don't they exhume the body? Why don't they
do the test? Because we know this is child abuse.

 

 MR. MANCIAS: Judge, I'm going to object to this, Judge. He's trying to
shift the burden of proof from the State where it belongs
to Esteban Villegas. 


 THE COURT: Sustained.


 To preserve error, a defendant's complaints may take three forms: "(1) a timely,
specific objection, (2) a request for an instruction to disregard, and (3) a motion for a
mistrial." Young v. State, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). In Young, the court
of criminal appeals noted:


 Because the objection, the request for an instruction to the jury, and the
motion for mistrial seek judicial remedies of decreasing desirability for events
of decreasing frequency, the traditional and preferred procedure for a party
to voice its complaint has been to seek them in sequence--that is, (1) to
object when it is possible, (2) to request an instruction to disregard if the
prejudicial event has occurred, and (3) to move for a mistrial if the party
thinks an instruction to disregard was not sufficient. However, this sequence
is not essential to preserve complaints for appellate review. The essential
requirement is a timely, specific request that the trial court refuses.


Id. at 69-70 (citations omitted); see Mathis v. State, 67 S.W.3d 918, 927 (Tex. Crim. App.
2002); Holberg v. State, 38 S.W.3d 137, 141 n.18 (Tex. Crim. App. 2000). As such, we
conclude that appellant has preserved this issue for appeal.

 The prosecutor's comments appear to be an answer to opposing counsel's
argument. Throughout the trial, appellant advanced the theory that Alex died from a
vitamin C deficiency. However, it was established that skull fractures are not typically
associated with a vitamin C deficiency. Therefore, the timing of Alex's skull fracture was
put at issue. Appellant offered expert testimony that suggested that the skull fracture
existed prior to the day of Alex's death and provided a whole host of potential causes for
the skull fracture, including Moya's theory that the skull fracture was a result of a difficult
child birthing procedure. It was established at trial that a microscopic examination was
necessary to date Alex's skull fracture. The record reflected that one microscopic
examination had already been done by Dr. Fernandez. However, in order to conduct
another microscopic examination in an attempt to refute Dr. Fernandez's findings, Alex's
body needed to be exhumed. It is clear that the prosecutor was simply referencing this fact
in response to appellant's argument that the skull fracture did not recently occur. (20) 
Therefore, in reviewing the record in its entirety, we do not find this comment to be
manifestly improper.

 Moreover, the trial court sustained appellant's objection to the prosecutor's
comments pertaining to the exhumation of Alex's body. Though not required to preserve
error, it was incumbent on appellant to ask that the jury be instructed to disregard the
comments as prejudicial and to seek a mistrial to ensure that the jury did not improperly
consider the prosecutor's comments. Young, 137 S.W.3d at 69. The record reflects that
appellant took neither of these remedial steps. We therefore conclude that the State's
closing argument was not "extreme or manifestly improper" and did not constitute
reversible error. See Gaddis v. State, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988)
(noting, "the jury argument must be extreme or manifestly improper, or inject new and
harmful facts into evidence to constitute reversible error."). Accordingly, we overrule
appellant's fifth issue.



 

III. Conclusion

 Having overruled all of appellant's issues, we affirm the judgment of the trial court. 

 _______________________

 DORI CONTRERAS GARZA,

 Justice


Do not publish. 

Tex.R.App.P. 47.2(b)

Memorandum Opinion delivered and 

filed this the 13th day of March, 2008. 





1. Appellant presented the affidavits of Thelma Quintanilla and Eduardo Perez to establish his
contention that the jury verdict was unreliable. See Tex. R. App. P. 21.3(c). The affidavit from juror Quintanilla
stated that she felt pressured by other jurors to change her vote to guilty and that it is likely that two other
jurors who originally were undecided were pressured to change their votes to guilty. Appellant asserts that
Quintanilla's guilty vote is not a fair expression of her opinion. Appellant also asserted that the affidavit of
Eduardo Perez established that the jury relied upon the unreliable testimony of the State's expert witnesses
as it pertained to identity and the date of Alex's skull fractures. Appellant therefore contends that Perez's
affidavit also establishes that the jury's verdict is unreliable. See id.
2. There is neither a date included in the trial court's order granting the State's motion to strike
appellant's juror affidavits nor a file stamp by the trial court; however, the order is signed by the trial judge and
has been made part of the record.
3. Specifically, in denying appellant's amended motion for new trial, the trial court noted that "the Court
is of the opinion that the evidence is legally sufficient to support the verdict. The Court declines to acquit
ESTEBAN VILLEGAS."
4. Specifically, appellant notes that: (1) "[t]here was nothing in [this case] like Nathan's [Nathan v.
State, 611 S.W.2d 69 (Tex. Crim. App. 1981)] saying he had gotten rid of a person"; (2) unlike Skelton v.
State, 795 S.W.2d 162 (Tex. Crim. App. 1990), "[t]here is no evidence here that the father threatened his own
child"; (3) unlike Powell v. State, 822 S.W.2d 231 (Tex. App.-El Paso 1991, no pet.), "[t]here was no
statement by the defendant that he had striken [sic] the child"; (4) "[t]here was no evidence . . . of a note
asking for forgiveness . . . [appellant] did not say that he struck the child. Nor was there any physical evidence
in [this case] like the similar knots in Camacho," see Camacho v. State, 765 S.W.2d 431 (Tex. Crim. App.
1989); (5) "In [this case] the evidence shows that the father was the last person seen with the child. The
evidence is no stronger in [this case] than it was in King," see King v. State, 638 S.W.2d 903 (Tex. Crim. App.
1982); and (6) "In [this case] there is no improbable explanation by [appellant]. The State had a stronger case
in Wright than it does in [this case]. But Wright was acquitted, on stronger evidence than that presented
against [appellant]," see Wright v. State, 603 S.W.2d 838 (Tex. Crim. App. 1980). 

 

 It is clear to this Court that the court of criminal appeals determined the above cited cases upon which
appellant relies using the old legal sufficiency standard which required the State to exclude all other
reasonable hypotheses. See, e.g., King, 638 S.W.2d at 904 ("A conviction based on circumstantial evidence
cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the
guilt of the defendant; proof amounting only to a strong suspicion or mere probability is insufficient."); Nathan,
611 S.W.2d at 75 (same); Skelton, 795 S.W.2d at 167-69 (same); Powell, 822 S.W.2d at 234 (same); Wright,
603 S.W.2d at 840 (same). The court of criminal appeals, in Geesa v. State, overruled the "reasonable
hypothesis" construct for legal sufficiency review. 820 S.W.2d 154, 156-161 ("[T]here is but one standard of
proof for criminal convictions and where the jury is properly instructed on that standard, a charge on
circumstantial evidence is valueless and invites confusion. . . . Rather than aiding jurors in applying the
reasonable doubt standard, an additional charge on circumstantial evidence focusing on the "reasonable
hypothesis" theory serves only to distract jurors from examining the proper standard of proof as the primary
focus of their deliberations."). 


 Appellant further notes that the dissent in Geesa demonstrated how the "Court of Criminal Appeals
has used both the Jackson standard and the "exclude every other reasonable hypothesis" construct to reach
the same result." 820 S.W.2d at 169 n.8 (Clinton, J., dissenting). Appellant then argues that either test would
yield the same result: that the evidence was legally insufficient. However, we find the dissent in Geesa to be
unpersuasive in light of the Court of Criminal Appeals' more recent determination that reviewing courts are
to examine circumstantial and direct evidence cases using the same legal sufficiency standard: the Jackson
standard. See Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).
5. Dr. Beth Treviño testified that appellant provided numerous "blame alternatives" and tried to
minimize the severity of Alex's fractured bones by stating "they're already healing." Dr. Treviño also noted that
appellant showed little concern for how Alex got the fractures in the first place. Christine Ketchum, a social
worker at Driscoll who interviewed appellant, Alex, and Ana Moya, Alex's mother, testified that Moya admitted
that she was unsure what happened the day Alex died. In addition, Ketchum noted that "[p]atient appears to
have been physically assaulted as per the injury patient shows as highly suspicious of child abuse. The family
appears to give no explanation of how patient came to injuries." Ketchum further testified that Alex exhibited
signs of past abuse, which neither Moya nor appellant could explain.
6. In Kelly v. State, the court of criminal appeals noted: 


 Factors that could affect a trial court's determination of reliability include, but are not limited
to, the following: (1) the extent to which the underlying scientific theory and technique are
accepted as valid by the relevant scientific community, if such a community can be
ascertained; (2) the qualifications of the experts testifying; (3) the existence of literature
supporting or rejecting the underlying scientific theory and technique; (4) the potential rate
of error of the technique; (5) the availability of other experts to test and evaluate the
technique; (6) the clarity with which the underlying scientific theory and technique can be
explained to the court; and (7) the experience and skill of the person(s) who applied the
technique on the occasion in question.


824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

7. On appeal, appellant appears to argue that the State's expert witnesses did not adhere to
professional norms in deriving their findings and subsequent testimony. However, appellant has not provided
this Court with an explanation as to how the State's expert witness did not adhere to professional norms. As
such, we find that this contention has been inadequately briefed. See Tex. R. App. P. 38.1(h). 
8. Although it appears to be good practice to conduct a microscopic examination to date bone
fractures, appellant has not cited to nor are we aware of any authority that requires the State to conduct a
microscopic examination, much less any other tests, to date a bone fracture during the course of a criminal
investigation. Moreover, appellant has not provided expert testimony disputing the methods used by Dr.
Fernandez in conducting the microscopic examination or his subsequent findings. Appellant merely argues
on appeal that a microscopic examination was not conducted and that Dr. Costa-Luna's testimony proves that
a skull fracture cannot be "accurately timed or dated without microscopic examination of both the fracture and
the skull."
9. In closing arguments, appellant first speculated about appellant and Moya being apart or perhaps
estranged and that stress resulted in appellant's frustration. Specifically, appellant's trial counsel argued "I
guess Mr. Almaguer, through his examination of Ms. Moya in asking her about not being able to sleep with
Ms. Moya [sic] [appellant] at night is an indication of some kind of a sexual frustration. I don't know what he
was driving at." Regardless, as later explained, the remaining evidence contained in the record is factually
sufficient to support appellant's conviction. 
10. Dr. Mitchell Hughston, the obstetrician who delivered Alex, also concluded that Alex was healthy
at birth and that there were no injuries to Alex's head at the time of birth.
11. The record does not contain any scientific literature or evidence supporting Dr. Martinez's theories
on Alex's death. Dr. Martinez admitted at trial that his theory was based on his own notes, which were not
admitted into evidence.
12. Dr. Bush notes that infantile scurvy is also known as Barlow's disease and that "acute infantile
scurvy" merely refers to the sudden onset of infantile scurvy.
13. Moya testified that she worked from 6:30 a.m. to about 6:00 p.m. The record also contains the
testimony of Maria Elena Moya, Ana's mother and Alex's grandmother, who testified that she was unable to
care for Alex on November 12, 2003, because she had been ill with the flu for several days and that appellant
asked for permission to care for Alex on those days.
14. It is this testimony upon which the State based its theory regarding Alex's death: appellant became
frustrated that Alex continually cried and that he had to miss his college classes for a fourth day in a row;
therefore, appellant shook Alex and threw him back into his crib.
15. Quintanilla, in her affidavit, also stated that the jurors voted "'guilty' because of the medical
testimony as to the age of the baby's skull fracture and the presence only of Esteban Villegas when the
doctors said the fracture to the skull occurred."
16. Though addressing article 36.22 of the Code of Criminal Procedure, the court of criminal appeals
has noted:


 The rule [that a juror cannot impeach his own verdict] is based upon controlling
considerations of public policy which in these cases chooses the lesser of two evils. When
the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is
made the basis of a motion for a new trial, the court must choose between redressing the
injury of the private litigant and inflicting the public injury which would result if jurors were
permitted to testify as to what happened in the jury room.

 

 . . . If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust
method in arriving at their verdict, and the defendant ought to have had relief, if the facts
could have been proved by witnesses who were competent to testify in a proceeding to set
aside the verdict. But let it once be established that verdicts solemnly made and publicly
returned into court can be attacked and set aside on the testimony of those who took part in
their publication and all verdicts could be, and many would be, followed by an inquiry in the
hope of discovering something which might invalidate the finding. Jurors would be harassed
and beset by the defeated party in an effort to secure from them evidence of facts which
might establish misconduct sufficient to set aside a verdict. If evidence thus secured could
be thus used, the result would be to make what was intended to be a private
deliberation, the constant subject of public investigation; to the destruction of all
frankness and freedom of discussion and conference.


State ex rel. Rosenthal v. Poe, 98 S.W.3d 194, 202 n.12 (Tex. Crim. App. 2003) (quoting McDonald v. Pless,
238 U.S. 264, 266-68 (1915)) (emphasis in original). 
17. The Texas Supreme Court has also weighed in on juror misconduct stating that public policy
demands that jury deliberations be kept private because: "(1) jurors must be encouraged to candidly discuss
the case during deliberations; (2) jurors must be protected from post-trial harassment and tampering; (3)
disgruntled jurors must be denied an avenue for overturing the verdict; and (4) there is a need for finality in
litigation." Glover v. State, 110 S.W.3d 549, 551 (Tex. App.-Waco 2003, pet. ref'd) (addressing also rule
606(b)'s companion, rule 327(b) of the Texas Rules of Civil Procedure) (citing Golden Eagle Archery, Inc. v.
Jackson, 24 S.W.3d 362, 367 (Tex. 2000). The supreme court also noted that neither rule 606(b) of the rules
of evidence nor rule 327(b) of the rules of civil procedure prohibits a non-juror from testifying about alleged
misconduct during deliberations. See Golden Eagle Archery, 24 S.W.3d at 369; see also Tex. R. Evid. 606(b);
Tex. R. Civ. P. 327(b).
18. Appellant also included an affidavit from Eduardo Perez in his original motion for new trial. Perez
alleges in his affidavit that the jury "voted 'guilty' because of the medical testimony as to the age of the baby's
skull fracture and the presence only of Esteban Villegas when the doctors said the fracture to the skull
occurred." Perez does not make any allegations giving rise to any suspicion of juror misconduct (i.e. being
pressured to change a verdict). Appellant alleges that Perez's affidavit demonstrates that the jury erroneously
relied on the State's characterization of the facts given that the State allegedly failed to prove identity and its
expert witnesses were allegedly unreliable. Appellant therefore asserts that, in light of the statements made
by Perez in his affidavit, the jury verdict was unreliable and that he is entitled to a new trial "in the interest of
justice." However, it is clear that Perez would be barred from testifying as to what happened during jury
deliberations because his affidavit does not establish (1) that an outside influence was improperly brought to
bear upon any juror or (2) that a juror was not qualified to serve. See Tex. R. Evid. 606(b). The trial court did
not abuse its discretion in granting the State's motion to strike Perez's affidavit.
19. The State correctly notes that (1) Dr. Turlipati testified that appellant could have been in shock; Dr.
Treviño testified that appellant could have been "stressed out"; and (3) Moya, appellant's wife, testified that
appellant was in shock. Therefore, it is clear that the jury was presented with evidence of appellant's shocked
nature at the scene of Alex's death. 
20. "Counsel is allowed wide latitude without limitation in drawing inferences from the evidence so long
as the inferences drawn are reasonable, fair, legitimate, and offered in good faith." Gaddis v. State, 753
S.W.2d 396, 398 (Tex. Crim. App. 1988).